97 P.3d 472

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Michael Scott GREENE, Defendant–Appellant.**

No. 28746.

Court of Appeals of Idaho.

June 11, 2004.

Review Denied Sept. 13, 2004.

Molly J. Huskey, State Appellate Public Defender; Eric Don Fredericksen, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Lori A. Fleming, Deputy Attorney General, Boise, for respondent.

GUTIERREZ, Judge.

Michael Scott Greene appeals from the judgment of conviction entered upon his conditional guilty plea to possession of cocaine. We affirm.

## I.

## FACTUAL AND PROCEDURAL SUMMARY

The facts of this case are as set forth in the district court's memorandum decision:

On November 17, 2001 around midnight, Officer Smyth, a Bellevue Marshall, was patrolling the streets of Bellevue. From his patrol car, Smyth observed [Greene] and another individual in the parking lot of the bowling alley looking down at something and conversing. To better assess the situation, Officer Smyth drove through the parking lot, and as he approached, [Greene] and the other individual looked at the officer and then walked off in separate directions.

As [Greene] headed toward the east side of the parking lot, the officer approached and asked if he could talk with [him] for a minute. [Greene] replied "yes" and stopped walking. Officer Smyth then got out of his car and engaged in a conversation with [Greene]. According to the officer, [Greene] was very evasive in answering basic questions concerning who [Greene] was talking to, what they were talking about, and why he was there.

Officer Smyth asked [Greene] how long he had been at the bowling alley, and [Greene] replied only a few minutes. In response to the officer's question of how he got there, [Greene] stated that his girlfriend had driven; however, the officer observed that [Greene's] girlfriend was asleep in the back seat of [Greene's] Jeep. Smyth then asked [Greene] how his girlfriend could have driven when she was asleep in the back seat and [Greene] did not respond to the question. In addition, Officer Smyth detected a strong odor of alcohol on [Greene] and noticed that he appeared to be intoxicated. Officer Smyth asked him if he had been drinking and [Greene] responded that he had not been drinking.

About three-quarters of the way through the conversation between Officer Smyth and [Greene], Greene's girlfriend exited the vehicle and appeared to be extremely intoxicated. Officer Smyth asked her to go take a seat in the back of the Jeep.

Throughout this encounter, [Greene] acted "extremely nervous" and kept placing his hands in his pockets, despite Officer Smyth's continued requests to [Greene] to keep his hands out of his pockets. Officer Smyth explained that he did not want [Greene] to have his hands in his pockets for officer safety reasons. Whereas, [Greene] claimed that he was cold. Officer Smyth estimated that [Greene] placed his hands in his pockets up to twenty times.

Based upon these circumstances, Officer Smyth asked [Greene] if he minded if the officer patted him down for weapons and [Greene] responded that he would. Despite [Greene's] objection, the [o]fficer patted him down anyway. As Officer Smyth commenced the pat down, [Greene] then took his left hand from behind his head, reached across his body, placed his open hand into his right pocket, pulled something out of his pocket with a closed grip, rammed his fist down into the crotch area of his pants, and pulled out an open hand. Officer Smyth asked [Greene] what he had just stuck down his pants and [Greene] responded that he did not know what the officer was talking about.

Because of [Greene's] actions, Officer Smyth placed [Greene] in handcuffs as Officer Whitehead arrived at the scene. Officer Smyth asked Whitehead to watch [Greene] so that he could go and locate the other individual who had walked away earlier. Shortly thereafter, Officer Smyth returned and continued the pat down. Not feeling anything in [Greene's] pockets, Officer Smyth then grabbed the back of the waistband of [Greene's] pants, shook it, and a baggy of cocaine fell out of [Greene's] pant leg onto the ground. At

that point Officer Smyth arrested [Greene] for possession of cocaine.

Greene was thereafter charged with felony possession of cocaine, I.C. § 37–2732(c)(1). He filed a motion to suppress evidence, contending the search was in violation of the Fourth Amendment to the United States Constitution. After a hearing, the district court denied Greene's motion. Greene then entered a conditional plea of guilty, reserving the right to appeal the denial of his suppression motion. Greene appeals.

## II.

## ANALYSIS

Greene argues that the district court erred in denying his motion to suppress because the search conducted by Officer Smyth violated Greene's Fourth Amendment rights.

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact which are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson,* 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct.App.1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez–Molina,* 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers,* 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct.App.1999).

The Fourth Amendment to the United States Constitution and Article 1, § 17 of the Idaho Constitution prohibit unreasonable searches and seizures. Warrantless searches are presumed to be unreasonable, but the state can rebut this presumption by establishing that a search falls within a recognized exception to the warrant requirement or is otherwise reasonable under the circumstances. *State v. Weaver,* 127 Idaho 288, 290, 900 P.2d 196, 198 (1995); *State v. McIntee,* 124 Idaho 803, 804, 864 P.2d 641, 642 (Ct.App.1993). Evidence discovered in result of an illegal search will be excluded as "fruit of the poi-

sonous tree." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), police may conduct a warrantless search of a person, without an arrest, if they are conducting the search for the limited purpose of discovering weapons. Analysis under *Terry* requires inquiry into the validity of both the stop and the frisk. *State v. Fleenor,* 133 Idaho 552, 556, 989 P.2d 784, 788 (Ct.App.1999). Each prong is tested separately, and the reasonableness of each must be independently determined. *Id.* Greene does not challenge the validity of the stop, as he freely consented to speak with Officer Smyth, but argues that the frisk became unreasonable as it progressed and thereby became illegal.

Greene asserts that while Officer Smyth may have had adequate justification to conduct a *Terry* frisk, the officer exceeded the permissible scope of a *Terry* frisk by shaking the waist of Greene's pants after completing the pat down and having found no weapons or other contraband. Greene argues that only after an officer conducts a frisk of the outer clothing of a defendant and locates an object which he determines might be a weapon may the officer pursue a further, more intrusive search to determine the nature of the unknown object in the interest of officer safety. Insofar as it goes, this statement accurately reflects how the United States Supreme Court has interpreted *Terry. See, e.g., Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). However, limited exceptions to this standard have been recognized. There are occasions where considerations of officer safety require a more intrusive and extensive search. We note that these exceptions do not "expand the scope" of *Terry,* as both Greene and the state argue, because such situations are contemplated by, and thus within the ambit of, *Terry:* "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine

whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry,* 392 U.S. at 24, 88 S.Ct. 1868. The most common circumstance justifying such an exception is where the suspect makes threatening movements. *See* WAYNE R. LAFAVE, SEARCH AND SEIZURE, § 9.5(b) (3d ed.1996).

■ In the instant matter, the district court found that during the pat down Greene "pulled something out of his pocket with a closed grip, rammed his fist down into the crotch area of his pants, and pulled out an open hand." When Officer Smyth asked Greene what he had just stuck down his pants, Greene responded that he did not know what the officer was talking about. At that point, Officer Smyth handcuffed Greene and asked a second officer, who had just arrived, to watch Greene. Officer Smyth then attempted to locate the individual he had seen with Greene. Unable to locate that person, Officer Smyth returned and resumed the pat down. Ultimately, Officer Smyth shook Greene's waistband, dislodging what turned out to be a baggy of cocaine.

Although it may not be enough that the officer observe the suspect put "something" in his pocket, *Merritt v. State,* 133 Ga.App. 956, 213 S.E.2d 84 (1975), other jurisdictions have concluded that certain types of furtive movements can be sufficiently threatening under the circumstances to warrant a heightened officer response during a *Terry* stop. *See* LAFAVE, SEARCH AND SEIZURE, § 9.5(b), pg. 273, note 143. Included among these cases are *State v. Warren,* 124 Ariz. 279, 603 P.2d 550 (App.1979) (where suspect grabbed the officer's hand and kept his own placed in such a way so as to thwart pat down), *People v. Shackelford,* 37 Colo.App. 317, 546 P.2d 964 (1976) (when asked to hold his hands out to the side, suspect turned his hand in such a way that police could not tell what he was holding), *State v. Serrano,* 14 Wash.App. 462, 544 P.2d 101 (1975) (where suspect took his hand out of his pocket, jerked back, and thrust that hand behind his back), and *People v. Superior Court,* 15 Cal.App.3d 806, 94 Cal.Rptr. 728 (1971) (where suspect made a sudden move to his pocket despite a police order to keep his hands in plain view).

It is clear that encounters between police officers and citizens are not static; rather they are fluid and developing. Greene picks out discrete moments in his encounter with Officer Smyth in support of his argument, but the Idaho Supreme Court has concluded that the proper inquiry in evaluating the reasonableness of a *Terry* frisk is to examine the totality of the circumstances and ask whether the facts available to the officer at the time of the stop gave rise to a reasonable inference of a risk of danger. *State v. Wright,* 134 Idaho 73, 76, 996 P.2d 292, 295 (2000). Greene concedes that the purpose of a *Terry* search is to allow an officer to pursue an investigation without fear of violence, but implies that no weapon could be small enough to fit in his fist or in his pants. We disagree. Many weapons are engineered to be readily concealed, and even everyday items such as razor blades or multi-tool devices can be easily secreted in a fist or down one's pants where they might be quickly accessed with tragic result.

When Greene transparently attempted to re-position some unknown object out of his pocket and into his waistband, Officer Smyth momentarily abandoned the pat down in order to handcuff Greene. As another officer arrived on the scene, Officer Smyth briefly left in order to attempt to find the person with whom Greene had earlier been talking. He then returned and renewed the pat down. This delay was reasonable, as there is no rigid time limitation on *Terry* stops. *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). At the conclusion of the pat down, Officer Smyth shook Greene's waistband, dislodging the object Greene had earlier placed there. By shaking Greene's waistband, Officer Smyth chose an unintrusive measure in an ongoing, developing effort to ensure the safety of himself and others in the area. The other means available to Officer Smyth to discover whether Greene had attempted to re-position a weapon for easier access, including reaching inside Greene's pants, though perhaps within the spectrum of allowable responses under *Terry,* would have been more intrusive. *See e.g., State v. Kearney,* 183 N.J.Super. 13, 443 A.2d 214 (1981) (where the court held it was prop-

er for the officer to reach directly into suspect's pocket where the suspect repeatedly backed away during pat down).

In short, Officer Smyth's decision to tug on Greene's waistband was a measured protective response to the facts available to him, facts that include the lateness of the hour, Greene's apparent intoxication, evasiveness in answering basic questions, failure to keep his hands out of his pockets despite repeated admonitions, and his transparent attempt to re-position some item on his person during the search. We further conclude that Officer Smyth used the least intrusive means available, shaking Greene's waistband, to ensure his and Officer Whitehead's safety.

## III.

### CONCLUSION

We conclude that Officer Smyth did not act outside the scope of a *Terry* stop and frisk by shaking the waistband of Greene's pants following Greene's attempt to conceal some item on his person. Therefore, the district court did not err in denying Greene's motion to suppress evidence. Accordingly, Greene's judgment of conviction for possession of a controlled substance is affirmed.

Chief Judge LANSING and Judge PERRY concur.