**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Juan Carlos FUENTES, Defendant–Appellant.**

**No. 96–30144.**

United States Court of Appeals,
Ninth Circuit.

Submitted Dec. 10, 1996.*

Decided Jan. 21, 1997.

George Paul Trejo, Jr., Trejo Law Offices, Yakima, Washington, for defendant-appellant.

Jane M. Kirk, Assistant United States Attorney, Yakima, Washington, for plaintiff-appellee.

---

* The panel unanimously finds this case suitable for decision without oral argument. Fed. R.App. P. 34(a); 9th Cir. R. 34–4.

Before JOHN T. NOONAN, Jr., THOMPSON and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

Fuentes argues that his motion to suppress cocaine found in his pocket should have been granted, because his *Terry* stop at the airport was not based on reasonable suspicion, and because he was arrested without probable cause.

## I. FACTS

Fuentes was stopped at the Yakima airport, by a local police officer working with the DEA, and a DEA agent. The district judge found that these were the reasons for the stop, and that these reasons gave rise to reasonable suspicion:

1. Yakima is a major narcotics transfer point;

2. the transfers "sadly relate to and often involve people, young people of Hispanic heritage";

3. Fuentes carried no luggage the first time he tried to board a plane, and then returned with other people a second time carrying luggage;

4. an officer with 16 years experience testified that Fuentes was looking around the airport as if he were watching for law enforcement people;

5. Fuentes waited outside in a car with others until 6:05 p.m., even though he had arrived in the car at 6:00 and his flight was to take off at 6:15, thus minimizing his exposure to possible law enforcement surveillance in the airport, and one of the companions came in ahead of him apparently to do a lookout before Fuentes entered;

6. he bought a one way ticket for cash.

The officers testified that in addition, the following circumstances aroused their suspicion:

7. Fuentes did not shake hands or say good-bye to the two people who accompanied him to the airport the second time;

8. Fuentes kept feeling a lump in his right front pants pocket appearing to be about the size of a split softball, and he pulled his shirttail over it.

The stop was initiated by one of the officers saying "Hi, I'm from DEA, do you mind if we talk to you for a minute?" Fuentes looked at the officer's credentials and said, "No, why?" The reply was that DEA agents "sometimes speak to certain people in the airport," and to this Fuentes responded, "Well, okay." Fuentes looked nervous to the officers. One of them testified that the pulse rate in Fuentes's neck was rapid, his face was flushed and he was glancing around. In response to questions, Fuentes said his name was Rudy Morales; he had no identification on his person; he was traveling to Seattle; he had made no inquiries about connecting flights, because he lived in Seattle; and he had not been in the airport earlier that day.

The officers knew Fuentes was lying about not having been at the airport earlier, because they had seen him there. They had seen him come in 5:00 p.m. One officer stood behind him in line when a ticket agent told him the flight he wanted had already boarded, and then in another line when Fuentes learned that the next flight to Seattle was at 6:15. Then he drove away with companions. They also knew he was lying about not having made inquiries about connecting flights, because the ticket agent had told them Fuentes had tried to book a flight from Yakima to Seattle, and a connecting flight from Seattle to Anchorage.

One of the officers testified that Fuentes was "paying what seemed like an unusual amount of attention to the lump in his pocket." The officer asked Fuentes if "he wouldn't mind us searching his person and his bag." Fuentes seemed irritated and he dropped his bag, coat and ticket on the floor, raised his hands "about halfway" and said, "search anything you want." The officer testified that he told Fuentes he did not have to allow him to search, but Fuentes responded "go ahead."

The officer then reached inside Fuentes' right front pocket, where he had noticed the split-softball sized lump. He testified that "I put my hand on what felt to me like a thick rubbery bulge and through that I could feel four other semisoft lumps contained inside the thicker rubber." He testified that based on his experience, that an ounce of cocaine is often packaged as a golf-ball sized lump, he "drew a fairly immediate conclusion in my mind that I was touching narcotics" when he felt the four lumps. The judge did not find that this last bit of testimony was true. Because "that isn't what he told us in his report," the judge found that the officer did not draw the inference that he was touching narcotics until he got the ball out of Fuentes's pocket and examined it.

The timing mattered, because of an intervening event, between when the police officer reached into Fuentes's pocket, and when he pulled the cocaine package out. The officer said, "What's this," and Fuentes shouted "No, wait." Fuentes tried to push one officer away with one arm, and pull his other arm free of the second officer's grip. This happened before the officer got the package out. After Fuentes's attempt to flee, the officers placed Fuentes under arrest, handcuffed him, and pulled the child's toy ball with the cocaine in it out of his pocket.

Fuentes moved to suppress the cocaine. The government argued that the agents' encounter with Fuentes and the search were consensual. After thoughtful consideration of the testimony and exhibits, the district judge concluded that the encounter had not been consensual, and was instead a *Terry* stop. He found that Fuentes had consented to the search, including reaching into his pocket, but revoked his consent before the officer pulled the toy with the cocaine out of his pocket, and before the officer reached the conclusion that it was cocaine. But, the district judge concluded, Fuentes's flight attempt, combined with all the articulated reasons the officers by then had for believing Fuentes was carrying narcotics, gave them probable cause to arrest him. They did, and found the narcotics in a permissible search incident to arrest.

## II. ANALYSIS

The district judge's analysis was careful, thorough, and in our view, correct.

All it takes for a stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), is "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). The articulated facts sufficed for that. *See United States v. Fouche*, 776 F.2d 1398, 1402 (9th Cir.1985).

■ Reaching into Fuentes's pocket did not have to be justified as a *Terry* frisk, because Fuentes consented to it. The judge found that he consented, and we review the finding of fact only for clear error, *United States v. Nance*, 962 F.2d 860, 862 (9th Cir. 1992). There was none.

■ Fuentes was arrested before the officers pulled out the cocaine. The district judge did not accept the testimony that the officer knew when he felt the lump in Fuentes's pocket that it was cocaine, so that knowledge could not support a probable cause determination. Before the officers pulled the toy out of Fuentes's pocket and discovered the cocaine, they had arrested and handcuffed him. The arrest needed to be supported by "probable cause," *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879, that is, "facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed." *Beck v. State of Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964); *United States v. Ricardo D.*, 912 F.2d 337, 342 (9th Cir.1990).

By the time the officers arrested Fuentes, they knew these additional facts, in addition those which had led them to stop Fuentes and talk to him:

1. Fuentes seemed extremely nervous talking to them;

2. He had lied about the connecting flight;

3. He had lied about not being in the airport earlier;

490

4. He emphatically did not want the officers to feel and remove the split-softball sized lump;

5. He tried forcibly to get away.

6. He claimed to have no identification on his person.

The facts known to the officers at the moment they arrested Fuentes would lead a person of reasonable caution to think that Fuentes probably had contraband in his right pants pocket. As he did.

Although the district court considered Fuentes's youth and ethnicity, we do not. Our review of the propriety of the *Terry* stop is *de novo.* *United States v. Carrillo,* 902 F.2d 1405, 1410–11 (9th Cir.1990). It is not suspicious for young or Hispanic persons to travel by air. *Cf. United States v. Fouche,* 776 F.2d 1398, 1402–03 (9th Cir.1985). There were plenty of good reasons supported by articulable facts for the officers to form a reasonable suspicion that criminal activity was taking place, listed at the beginning of the "Facts" section of this opinion.

As for flight, we do not suggest that if a police officer says to a person in an airport, "Do you mind if I talk to you?" and the person says, "I don't want to talk to you—I want to go catch my plane," that the person can be stopped or arrested. His refusal by itself does not give rise to reasonable suspicion or probable cause. Mere refusal to consent to a stop or search does not give rise to reasonable suspicion or probable cause. People do not have to voluntarily give up their privacy or freedom of movement, on pain of justifying forcible deprivation of those same liberties if they refuse. But we have held in other circumstances that when a suspect "sped off" from an automobile stop, his flight together with other evidence gave rise to probable cause. *United States v. Garcia,* 516 F.2d 318 (9th Cir.1975). *Cf. United States v. Ramirez,* 91 F.3d 1297, 1303–04 (9th Cir.1996); *United States v. Morrison,* 546 F.2d 319, 320 (9th Cir.1976); *United States v. Ogilvie,* 527 F.2d 330, 332 (9th Cir.1975). In Fuentes's case, a person of reasonable caution, evaluating his attempt forcibly to flee, in combination with more than a dozen facts then known, would believe that he probably had something highly incriminating in his right pants pocket.

AFFIRMED.