203 P.3d 1203

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Shane Marvin BISHOP, Defendant–Appellant.**

No. 35241.

Supreme Court of Idaho,
Boise, December 2008 Term.

Jan. 30, 2009.

Rehearing Denied March 13, 2009.

Molly Huskey, State Appellate Public Defender, Boise, for appellant. Shannon N. Romero argued.

Honorable Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent. Kenneth K. Jorgenson argued.

J. JONES, Justice.

Marvin Bishop was arrested after a search conducted by the Hagerman City Police revealed that he was in possession of methamphetamine. Bishop was subsequently charged with possession of drug paraphernalia, resisting an officer, and felony and misdemeanor possession of a controlled substance. After the district court denied his motion to suppress the methamphetamine, Bishop pleaded guilty to the felony possession and resisting charges. He then appealed the district court's denial of his motion to suppress. The Idaho Court of Appeals concluded that the district court erred in denying the motion. The State filed a petition for review with this Court, which was granted. We reverse the order denying the motion to suppress, vacate Bishop's conviction, and remand.

## I.

On May 26, 2005, Hagerman Police Chief, Loren Miller, was on call when he received a telephone call from the City Superintendent, Casey Kelley. Kelley informed Miller that

two carnival workers, who were in town working at Hagerman's Fossil Day weekend celebration, had approached him and indicated that a man, later identified as Bishop, had attempted to sell them methamphetamine. Kelley told Miller that the carnival workers had asked him to report the incident to the police and relayed the workers' description of Bishop. According to Kelley, the suspect had long hair, glasses, and was wearing a baseball cap and black clothes.

After reporting the incident to Miller, Kelley located Bishop and followed him to a local market. Kelley watched Bishop walk into the market and then called Miller a second time to report Bishop's current location. Miller arrived at the market while still on the phone with Kelley, who indicated that Bishop had just left the market and was walking south down a nearby alley. Miller identified Bishop as the man fitting Kelley's description and pulled up next to him in his patrol vehicle. Miller then told Bishop that he needed to speak with him, but Bishop only responded "hello" and kept walking. Unsatisfied with Bishop's response, Chief Miller exited his patrol vehicle and told Bishop to stop so they could talk. Bishop asked Miller what he wanted to talk about and Miller replied "methamphetamine." Upon hearing this, Bishop stopped walking and informed Miller that he was a Christian and that Jesus loved Miller. He also stated that he was on his way to work and had just gotten off probation.

During their brief conversation, Bishop and Miller were standing approximately five feet apart. Nonetheless, Miller was able to observe that Bishop's pupils were dilated, that he had bloodshot eyes, and that he had a "wild look in his eye." Based on these observations, Miller concluded that Bishop was likely under the influence of a narcotic.[1] Miller also noticed that Bishop appeared nervous and was holding a white grocery bag close to his chest.

Relying on these facts, Miller decided to frisk Bishop for weapons. When Miller informed Bishop that he was going to conduct a frisk, Bishop responded "no." Miller then told Bishop that unless he complied, he would be placed under arrest. Once Bishop learned that he may be arrested, he initially complied by turning around and placing his hands on the trunk of the patrol car so Miller could conduct the frisk. Once Miller began frisking Bishop, however, Bishop turned around and told Miller "no" again. Miller then informed Bishop that he was under arrest for resisting and obstructing a police officer. This did not please Bishop, who began to struggle in order to avoid being handcuffed. It was not until after back-up arrived that Miller was able to handcuff Bishop and finish conducting the search. During the search, Miller discovered a bag containing methamphetamine in Bishop's pocket.[2] Deputy Jeromy Smith then transported Bishop to the carnival where he was identified by the two carnival workers as the man who had tried to sell them methamphetamine.

Bishop was subsequently charged with possession of drug paraphernalia, resisting an officer, and felony and misdemeanor possession of a controlled substance. He filed a motion to suppress the methamphetamine recovered from his pocket on the grounds that Miller was not justified in conducting the stop or the frisk. The district judge denied Bishop's motion after concluding that both the stop and the frisk were constitutional. Bishop then pleaded guilty to felony possession of a controlled substance, I.C. § 37–2732(c)(1), and resisting an officer, I.C. § 18–705. The other two charges against him were dropped.

Bishop appealed the district court's denial of his motion to suppress.[3] The Court of Appeals concluded that Miller's frisk of Bishop was unconstitutional and, accordingly, vacated Bishop's judgment of conviction and

1. Bishop later admitted that he was under the influence of methamphetamine during the encounter.

2. Once Bishop was taken to jail, the police also discovered marijuana and drug paraphernalia,

however, Bishop's appeal does not relate to the discovery of that evidence.

3. Bishop entered into a conditional plea agreement, which preserved his right to appeal the trial court's denial of his motion to suppress.

remanded the case to the district court. *State v. Bishop*, 2007 Opinion No. 80, 9 (Ct. App.2007). Although the Court of Appeals acknowledged that the methamphetamine was discovered during the search incident to Bishop's arrest and not during the initial frisk, it based its decision on the legality of the frisk. *Id.* at 7. It reasoned that because the "frisk [was] inexorably entwined with subsequent events," the evidence discovered during the search should have been suppressed. *Id.*

The State filed a petition for review with this Court, which was granted. On review, the State argues that the Court of Appeals' decision was not in accordance with the law because the legality of the initial frisk does not control whether the evidence, which was recovered during a search incident to arrest, should be suppressed. Bishop, on the other hand, argues that the Court of Appeals correctly concluded that the methamphetamine should have been suppressed. He asserts that the evidence was the fruit of an unlawful stop and frisk.

## II.

On review, we are concerned with two issues: (1) whether Miller had reasonable suspicion to stop Bishop; and (2) whether the methamphetamine was discovered during a search incident to a lawful arrest.

## A.

 On review of a case from the Court of Appeals, this Court gives due consideration to the Court of Appeals' decision, but directly reviews the decision of the trial court. *See State v. Sheahan*, 139 Idaho 267, 272–73, 77 P.3d 956, 961–62 (2003). When reviewing a trial court's denial of a defendant's motion to suppress, this Court gives deference to the trial court's findings of fact, which will be upheld so long as they are not clearly erroneous. *State v. Henage*, 143 Idaho 655, 658, 152 P.3d 16, 19 (2007). Findings of fact are not clearly erroneous if they are supported by substantial and competent evi-

dence. *Id.* at 659, 152 P.3d at 20. Decisions regarding the credibility of witnesses, weight to be given to conflicting evidence, and factual inferences to be drawn are also within the discretion of the trial court. *See State v. Valdez–Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995). This Court exercises free review, however, over the trial court's conclusions regarding "whether constitutional requirements have been satisfied in light of the facts found." *Henage*, 143 Idaho at 658, 152 P.3d at 19. Accordingly, this Court freely reviews the constitutionality of a search and seizure. *See State v. Aguirre*, 141 Idaho 560, 562, 112 P.3d 848, 850 (Ct.App.2005).

## B.

The State argues that Miller's decision to stop Bishop was justified by reasonable suspicion and, therefore, did not taint the subsequent discovery of methamphetamine. Bishop, however, argues that the stop was unreasonable. He maintains that the third-hand information Chief Miller received from Superintendent Kelley did not give Miller reasonable suspicion to conduct a stop. According to Bishop, such "hearsay upon hearsay" information cannot amount to reasonable suspicion unless it is conveyed to the stopping officer by another police officer or is independently corroborated by the police. He contends that the illegality of the stop tainted the subsequent search and, therefore, that the methamphetamine should have been excluded.

 The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." [4] U.S. CONST. amend. IV. This guarantee has been incorporated through the Due Process Clause of the Fourteenth Amendment to apply to the states. *See, e.g., Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1089 (1961). Evidence obtained in violation of the amendment general-

---

4. Neither Bishop nor the State rely on Article I, section 17 of the Idaho Constitution in making their arguments. Accordingly, the analysis in this opinion relies exclusively on the Fourth Amendment to the United States Constitution. *See State v. Zapata–Reyes*, 144 Idaho 703, 706 n. 1, 169 P.3d 291, 294 n. 1 (Ct.App.2007).

ly may not be used as evidence against the victim of the illegal government action. *State v. Page,* 140 Idaho 841, 846, 103 P.3d 454, 459 (2004); *see also Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 453 (1963). This rule, known as the exclusionary rule, applies to evidence obtained directly from the illegal government action and to evidence discovered through the exploitation of the original illegality, or the fruit of the poisonous tree. *Page,* 140 Idaho at 846, 103 P.3d at 459; *Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. at 417–18, 9 L.Ed.2d at 455. The test is "'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of [the original] illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455 (quoting MAGUIRE, EVIDENCE OF GUILT 221 (1959)). Under this test, evidence that is sufficiently attenuated from the illegal government action may be admitted at trial. *Page,* 140 Idaho at 846, 103 P.3d at 459; *see also Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455. When a defendant moves to exclude evidence on the grounds that it was obtained in violation of the Fourth Amendment, the government carries the burden of proving that the search or seizure in question was reasonable. *State v. Anderson,* 140 Idaho 484, 486, 95 P.3d 635, 637 (2004).

The Fourth Amendment's reasonableness requirement has been held to apply to brief investigatory detentions. *See Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889, 904 (1968). To determine whether such seizures are reasonable, courts first ask "whether the officer's action was justified at its inception." *Id.* at 19–20, 88 S.Ct. at 1878–79, 20 L.Ed.2d at 904–05. The level of justification required depends on the intrusiveness of the seizure. *Id.* at 20–22, 88 S.Ct. at 1879–80, 20 L.Ed.2d at 905–06. Next, they consider whether the action "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 19–20, 88 S.Ct. at 1878–79, 20 L.Ed.2d at 904–05.

Typically, seizures must be based on probable cause to be reasonable. *Florida v. Royer,* 460 U.S. 491, 499–500, 103 S.Ct. 1319, 1324–1325, 75 L.Ed.2d 229, 237–238 (1983). However, limited investigatory detentions, based on less than probable cause, are permissible when justified by an officer's reasonable articulable suspicion that a person has committed, or is about to commit, a crime. *Id.* at 498, 103 S.Ct. at 1324, 75 L.Ed.2d at 236. Reasonable suspicion must be based on specific, articulable facts and the rational inferences that can be drawn from those facts. *See State v. Sheldon,* 139 Idaho 980, 983, 88 P.3d 1220, 1223 (Ct.App.2003); *Terry,* 392 U.S. at 21, 88 S.Ct. at 1879, 20 L.Ed.2d at 905. The quantity and quality of information necessary to establish reasonable suspicion is less than that necessary to establish probable cause. *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301, 308 (1990). Still, reasonable suspicion requires more than a mere hunch or "inchoate and unparticularized suspicion." *Id.* at 329, 110 S.Ct. at 2415, 110 L.Ed.2d at 308 (quoting *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989)). Whether an officer possessed reasonable suspicion is evaluated based on the totality of the circumstances known to the officer at or before the time of the stop. *Sheldon,* 139 Idaho at 983, 88 P.3d at 1223; *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621, 628–29 (1981).

An informant's tip regarding suspected criminal activity may give rise to reasonable suspicion when it would "warrant a man of reasonable caution in the belief that a stop was appropriate." *White,* 496 U.S. at 329, 110 S.Ct. at 2415, 110 L.Ed.2d at 308 (quoting *Terry,* 392 U.S. at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906) (internal quotation and alteration marks omitted). Whether a tip amounts to reasonable suspicion depends on the totality of the circumstances including the substance, source, and reliability of the information provided. *See id.* at 328–29, 110 S.Ct. at 2415, 110 L.Ed.2d at 307–08 (noting that "an informant's 'veracity,' 'reliability,' and 'basis of knowledge'" are highly relevant factors in determining whether reasonable suspicion exists). In other words, a tip must

possess adequate indicia of reliability in order to justify a *Terry* stop. *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 617 (1972). The more reliable the tip, the less information required to establish reasonable suspicion. *White,* 496 U.S. at 330, 110 S.Ct. at 2416, 110 L.Ed.2d at 308. Factors indicative of reliability include whether the informant reveals his or her identity and the basis of his or her knowledge, whether the location of the informant is known, whether the information was based on first-hand observations of events as they were occurring, whether the information the informant provided was subject to immediate confirmation or corroboration by police, whether the informant has previously provided reliable information, whether the informant provides predictive information, and whether the informant could be held criminally liable if the report were discovered to be false. *White,* 496 U.S. at 331–32, 110 S.Ct. at 2416–17, 110 L.Ed.2d at 309–10; *Williams,* 407 U.S. at 146–47, 92 S.Ct. at 1923–24, 32 L.Ed.2d at 617; *State v. Larson,* 135 Idaho 99, 101–02, 15 P.3d 334, 336–37 (Ct.App.2000). If a tip lacks adequate indicia of reliability, police generally must engage in further investigation before conducting a *Terry* stop. *Williams,* 407 U.S. at 147, 92 S.Ct. at 1923, 32 L.Ed.2d at 617.

■ Whether a tip that merely provides a description of a suspect and alleges that he or she committed a crime amounts to reasonable suspicion depends on whether the tip was anonymous. *See Florida v. J.L.,* 529 U.S. 266, 271–72, 120 S.Ct. 1375, 1378–79, 146 L.Ed.2d 254, 260–61 (2000); *see also State v. Van Dorne,* 139 Idaho 961, 965, 88 P.3d 780, 784 (Ct.App.2004). When such a tip is received from an anonymous informant, the tip generally will not give rise to reasonable suspicion. *See J.L.,* 529 U.S. at 271–72, 120 S.Ct. at 1378–79, 146 L.Ed.2d at 260–61 (concluding that a tip that a young man was carrying a gun did not give rise to reasonable suspicion because the anonymous informant merely alleged that the man committed a crime and provided a description of the suspect). On the other hand, when such a tip is received from a known citizen-informant, the tip is generally sufficient to establish reasonable suspicion. *Van Dorne,* 139 Idaho at 965,

88 P.3d at 784 (concluding that a known citizen-informant's tip indicating that the suspect was likely intoxicated and describing the suspect's vehicle provided police with reasonable suspicion to conduct a stop). Tips made by known citizen-informants are presumed reliable because the informant's reputation can be assessed and, if the informant is untruthful, he or she may be subject to criminal liability for making a false report. *Id.* Accordingly, independent police verification of such tips is generally not necessary. *Id.; see also Williams,* 407 U.S. at 146–47, 92 S.Ct. at 1923–24, 32 L.Ed.2d at 617. Still, under the totality of the circumstances analysis, the content of the tip and the informant's basis of knowledge remain relevant in determining whether the tip gave rise to reasonable suspicion. *See State v. Zapata–Reyes,* 144 Idaho 703, 708, 169 P.3d 291, 296 (Ct. App.2007).

■ An informant need not necessarily give the police his or her name to be considered a known citizen-informant. *Larson,* 135 Idaho at 102, 15 P.3d at 337; *see also United States v. Pasquarille,* 20 F.3d 682, 687 (6th Cir.1994) (concluding that an informant who called in a report of drug dealing was not anonymous because he identified himself as a person that was transporting prisoners and personally observed the reported illegal activity). Typically, any information that makes the informant's identity readily ascertainable will suffice. *Larson,* 135 Idaho at 102, 15 P.3d at 337; *see also United States v. Reaves,* 512 F.3d 123, 127 (4th Cir.2008) (stating that police may conclude tipster is credible when he or she "provides enough information to allow the police to readily trace her identity"). This is especially true when it is clear that the informant is not trying to conceal his or her identity; for example, when the informant is seeking police assistance or reporting illegal activity that he or she personally observed. *Larson,* 135 Idaho at 102, 15 P.3d at 337.

Bishop argues that the tip in this case should be regarded as anonymous. In making his argument, Bishop relies on the fact that Superintendent Kelley's report was based on information obtained from two un-

named carnival workers rather than Kelley's own personal observations. If Bishop's characterization of the tip as anonymous were correct, the tip would not give rise to reasonable suspicion because it merely alleged that Bishop had committed a crime and provided a description of his present appearance and location. Miller would have had to corroborate the tip or conduct an independent investigation in order to legally stop Bishop. *See White,* 496 U.S. at 330–32, 110 S.Ct. at 2416–17, 110 L.Ed.2d at 308–10.

Bishop's argument for characterizing the tip as anonymous is unpersuasive. Superintendent Kelley, the individual who actually reported Bishop's alleged attempt to sell methamphetamine, was a known citizen-informant. There is no dispute that Chief Miller knew Kelley's identity at the time Kelley phoned in the tip. Further, by reporting the tip to Chief Miller, Kelley subjected himself to possible criminal liability under Idaho Code section 18–705, which makes it a crime to "knowingly give[ ] a false report to any peace officer." Because Kelley was a known citizen-informant, his reliability is presumed.

The fact that Kelley's tip was based on a report from two unnamed carnival workers does not transform his report into an anonymous tip. Instead, the source of Kelley's information is only relevant in assessing his basis of knowledge. Bishop points to no authority to support the proposition that a citizen-informant's tip should be reclassified as anonymous based solely on his or her basis of knowledge. Moreover, Bishop's argument disregards the fact that the carnival workers were not anonymous; instead, their identities were readily ascertainable. Kelley provided police with sufficient information to trace the workers' identities. This is evidenced by the fact that Deputy Smith was able to locate the workers and have them identify Bishop after he was arrested. And, while it is not clear why the workers reported their allegations to Superintendent Kelley rather than directly to the police, there is no evidence that the workers were trying to conceal their identities. Because both Kelley and the carnival workers were known citizen-informants, the tip is presumptively reliable.

Under the totality of the circumstances, however, the content of the tip and the informants' basis of knowledge are still relevant.

Bishop argues that the carnival workers' hearsay statements, which Kelley relayed to Chief Miller, cannot amount to reasonable suspicion. He contends that a hearsay tip can only amount to reasonable suspicion when the hearsay statement is made by a police officer. He relies on *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) and *United States v. Merritt,* 695 F.2d 1263 (10th Cir.1982), in making this argument. In *Hensley,* the United States Supreme Court held that a police officer who lacked personal knowledge of the facts giving rise to reasonable suspicion may stop an individual based solely on a wanted flyer as long as the officer who issued the flyer had reasonable suspicion to believe that the individual committed a crime. *Hensley,* 469 U.S. at 232, 105 S.Ct. at 682, 83 L.Ed.2d at 614. Similarly, *Merritt* held that courts should look at the collective knowledge of police involved in a criminal investigation when determining whether an officer had reasonable suspicion to conduct a *Terry* stop. *Merritt,* 695 F.2d at 1268. Neither case, however, held that hearsay statements may give rise to reasonable suspicion *only* when they are made by police officers.

Although this Court has not specifically addressed whether "hearsay upon hearsay" tips may give rise to reasonable suspicion, other courts have concluded that similar hearsay statements may support a finding of reasonable suspicion and, in some instances, even probable cause. *See, e.g., C.B. v. Driscoll,* 82 F.3d 383, 385, 388 (11th Cir.1996); *United States v. Tucker,* 305 F.3d 1193, 1201 (10th Cir.2002); *State v. Yaw,* 58 Haw. 485, 572 P.2d 856, 859 (1977). Because reasonable suspicion is determined based on the totality of the circumstances, including an informant's basis of knowledge, the fact that a tip is based on hearsay information is only a factor to consider in determining whether a stop was justified—it is not an absolute bar to a finding of reasonable suspicion. *See Tucker,* 305 F.3d at 1200–01; *see also White,* 496 U.S. at 328–29, 110 S.Ct. at 2415–16, 110 L.Ed.2d at 306–08. However, the original

hearsay declarant's basis of knowledge, reliability, and veracity are also factors under the totality of the circumstances analysis. *See Tucker*, 305 F.3d at 1201; *United States v. Monteiro*, 447 F.3d 39, 45–46 (1st Cir.2006) (concluding that an informant's tip that was based on information his relative told him did not give rise to reasonable suspicion because the informant would not identify the relative and "police . . . had no way of knowing the [relative's] state of mind . . . when she gave her information, or whether she was a person who could be relied on to relate events accurately").

■ A citizen-informant's tip may give rise to reasonable suspicion even when it is based on a third party's observation of illegal activity. *See Tucker*, 305 F.3d at 1201; *see also United States v. Fernandez–Castillo*, 324 F.3d 1114, 1119 (9th Cir.2003) (concluding that a report from the department of transportation that two of its employees witnessed erratic driving by a specific vehicle on a specific road was reliable); *Driscoll*, 82 F.3d at 388 (holding that a tip from a known student that another student told him the defendant had drugs hidden in his coat amounted to reasonable suspicion); *United States v. Gonzales*, 897 F.2d 504, 507 (10th Cir.1990) (concluding that an "informant's knowledge may be based on hearsay or even double hearsay"). In *Tucker*, an employee at the United States Attorney's Office, Corina Groneman, phoned in a tip that Tucker, who was on parole after serving time for sexually abusing a child, had viewed child pornography and contacted a child in violation of his parole. *Tucker*, 305 F.3d at 1196. Groneman obtained this information from a friend, who learned of Tucker's behavior through another friend. *Id.* The second friend directly witnessed Tucker's behavior while visiting Tucker at his home. *Id.* Both friends were current government employees but, because they wished to remain anonymous, their identities were otherwise unknown. *Id.*

Based on the tip, several police and parole officers conducted a search of Tucker's house.[5] *Id.* A cursory search of Tucker's computer revealed that he had likely visited several child pornography websites and had recently deleted several files. *Tucker*, 305 F.3d at 1196–97. Tucker moved to suppress the evidence obtained during the search, arguing that the officers did not have reasonable suspicion. *Id.* at 1198. The trial court, however, rejected his argument and denied the motion. *Id.*

On appeal, the Tenth Circuit Court of Appeals held that the evidence was properly admitted and that Groneman's tip provided the officers with reasonable suspicion. *Id.* at 1201. The court reasoned that the source and content of the tip, as well as the informant's basis of knowledge, indicated that the tip was reliable. *Id.* Initially, it emphasized that Groneman was a citizen-informant whose tip was to be presumed reliable. *Id.* Because Groneman's identity was known, she could be held accountable if her allegations turned out to be false. *Id.* Next, the court concluded that Groneman had an adequate basis of knowledge. *Id.* Even though the precise identities of the two friends who reported the information to Groneman were unknown, the second friend was not "completely anonymous" because Groneman had informed police that the friend was one of Tucker's co-workers. *Id.* Finally, the content of the tip indicated that it was reliable. *Id.* The tip "related the circumstances under which [the second friend] was in Tucker's apartment, that Tucker possessed a computer containing child pornography, and Tucker's statements regarding his attraction to young girls." *Tucker*, 305 F.3d at 1201. Because the tip was from a known citizen-informant whose basis of knowledge was adequately explained and detailed, it provided the officers with reasonable suspicion to conduct the search. *Id.* The fact that the police

---

5. Tucker's parole agreement permitted parole officers to search him and his residence without a warrant as long as they possessed reasonable suspicion. *Tucker*, 305 F.3d at 1195–96. Although the case involved a parolee and a search rather than a *Terry* stop, the court applied the same reasonable suspicion standard as the one explained above and, accordingly, the court's analysis of whether the tip amounted to reasonable suspicion is relevant. *See id.* at 1201 n. 10 (stating that "[b]ecause we are applying general Fourth Amendment principles . . . we look to the federal standard of reasonable suspicion").

did not corroborate any predictive details was irrelevant. *Id.*

Superintendent Kelley's tip that Bishop had attempted to sell methamphetamine to two carnival workers provided Miller with reasonable suspicion to stop Bishop. The tip possessed adequate indicia of reliability as evidenced by its source and content. Kelley was a known citizen-informant whose reliability could be presumed. Kelley informed Miller that Bishop had attempted to sell two carnival workers methamphetamine, provided a detailed description of Bishop, and was able to relay Bishop's precise location. Further, Kelley informed Chief Miller that his report was based on information he received directly from the two carnival workers, who had personally observed Bishop's attempt to sell them methamphetamine. Kelley's description of the carnival workers was far more detailed than the tipster's description of her sources in *Tucker,* which only indicated that the hearsay statements were made by one of the suspect's co-workers. In fact, Kelley was able to provide a detailed enough description of the workers for the police to locate them so they could identify Bishop. Because the workers' identities were readily ascertainable, they were also citizen-informants whose reliability could be presumed.[6]

The carnival workers' report to Kelley also possessed adequate indicia of reliability. The report was based on an alleged crime that the workers personally observed. The workers were able to provide a specific description of Bishop, which allowed Kelley to locate Bishop and provide Miller with a running report of Bishop's location. There is no evidence that the workers were trying to conceal their identities or were providing false information. Instead, the workers' decision to report the incident directly to a city official suggests that the opposite is true. Moreover, Kelley put enough trust in the workers' allegations to report it to the police. The fact that Kelley considered the report reliable is also evidenced by the fact that he decided to follow Bishop until Miller arrived.

Based on the totality of these circumstances, Chief Miller had reasonable suspicion to stop Bishop in order to investigate the allegations of criminal activity. Because the stop was justified, it could not have tainted the subsequent discovery of methamphetamine and we need not decide whether Bishop's arrest was an intervening circumstance that purged the taint of an illegal stop.

## C.

The State argues that the Court of Appeals' decision was not in accordance with the law because the court's finding that the frisk was unconstitutional did not justify its decision to exclude evidence recovered during a search incident to a lawful arrest. It maintains that the district court properly denied Bishop's motion to suppress. Bishop, on the other hand, argues that the State's characterization of the search as one incident to arrest is incorrect. He contends that the methamphetamine was recovered during an illegal pat-down search for weapons and, therefore, should have been excluded. Alternatively, Bishop argues that even if the methamphetamine was discovered during a search incident to arrest, it should have been suppressed because its discovery was tainted by an illegal stop, frisk, and arrest.

Generally, for a search to be reasonable it must be authorized by a valid search warrant that is based on probable cause. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967). Searches conducted without a warrant are considered *per se* unreasonable unless they fall into one of the "specifically established and well-delineated exceptions" to this general rule. *State v. Henderson,* 114 Idaho 293, 295, 756 P.2d 1057, 1059 (1988) (quoting *Katz,* 389 U.S. at 357, 88 S.Ct. at 514, 19 L.Ed.2d at 585). A search conducted incident to a lawful arrest is one such exception. *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134, 138 (1959); *see also State v. Baxter,* 144 Idaho 672, 680, 168 P.3d 1019, 1027 (Ct.App.2007).

---

6. This is true even though Miller did not obtain the workers' names or addresses before stopping Bishop.

As the name implies, this exception permits police officers to search individuals who have been lawfully arrested. *Virginia v. Moore,* —— U.S. ——, ——, 128 S.Ct. 1598, 1607, 170 L.Ed.2d 559, 570–71 (2008); *see also Baxter,* 144 Idaho at 680, 168 P.3d at 1027. While evidence obtained during a search incident to a lawful arrest is generally admissible, evidence obtained during a search subsequent to an unlawful arrest is not. *Miller v. United States,* 357 U.S. 301, 314, 78 S.Ct. 1190, 1198, 2 L.Ed.2d 1332, 1341 (1958); *Moore,* —— U.S. at ——, 128 S.Ct. at 1607, 170 L.Ed.2d at 570–71.

 In this case, it is clear that the methamphetamine in Bishop's pocket was recovered during a search incident to arrest. The evidence was not discovered during Miller's initial attempt to frisk Bishop, but only after Bishop was arrested for resisting Miller's attempt to conduct a frisk. The fact that the State was correct in characterizing the search as one incident to arrest, however, does not resolve the issue. Exclusion may still be necessary if Miller's arrest of Bishop was unlawful.

### 1.

The State argues that the methamphetamine discovered during the search incident to the arrest is admissible because Bishop was lawfully arrested. It maintains that Bishop's act of resisting Miller's attempt to conduct a frisk constituted a violation of Idaho Code section 18–705. According to the State, section 18–705 makes it a crime to resist even an unlawful search or seizure. Bishop argues that his arrest was unlawful and, therefore, that the evidence must be suppressed. He maintains that his refusal to submit to an unlawful frisk did not constitute a violation of section 18–705.

 For an arrest to be considered lawful, it must be based on probable cause. *See Moore,* —— U.S. at ——, 128 S.Ct. at

1607, 170 L.Ed.2d at 570–71. More specifically, an officer must "have probable cause to believe that a person has committed a crime in [his or her] presence." *Id.* at ——, 128 S.Ct. at 1608, 170 L.Ed.2d at 571–72; *see also* I.C. § 19–603 (authorizing a peace officer to arrest a person without a warrant "[f]or a public offense committed or attempted in [the officers] presence"). Probable cause exists when "the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been [or is being] committed." *Henry,* 361 U.S. at 102, 80 S.Ct. at 171, 4 L.Ed.2d at 138. Although an arresting officer is allowed some room for mistakes, the "mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusion of probability." *State v. Julian,* 129 Idaho 133, 137, 922 P.2d 1059, 1063 (1996) (quoting *Klingler v. United States,* 409 F.2d 299, 304 (8th Cir. 1969)). Good faith on the part of the officer is not enough. *Henry,* 361 U.S. at 102, 80 S.Ct. at 171, 4 L.Ed.2d at 138. Because Miller arrested Bishop for obstructing a public officer in violation of Idaho Code section 18–705, Miller must have had probable cause to believe that Bishop violated the statute for the arrest to be considered lawful.[7]

 Section 18–705 makes it a crime to "willfully resist[ ], delay[ ] or obstruct[ ] any public officer, in the discharge, or attempt to discharge, . . . any duty of his office." I.C. § 18–705. Three elements must be satisfied in order to find a violation of the statute: "(1) the person who was resisted, delayed or obstructed was a law enforcement officer; (2) the defendant knew that the person was an officer; and (3) the defendant also knew at the time of the resistance that the officer was attempting to perform some official act or duty." *State v. Adams,* 138 Idaho 624, 629, 67 P.3d 103, 108 (Ct.App.2003). Here, there is no dispute that Miller was a law enforcement officer and that Bishop was aware of this fact. The issue is whether Miller was

---

7. The State argues that Bishop did not contest the legality of his arrest for resisting and obstructing in his reply brief on review and that he conceded that he was not challenging the validity of his conviction for resisting and obstructing in front of the Court of Appeals. However, in his brief on review, Bishop argued that "Chief Mil-

ler's arrest of Mr. Bishop for obstructing an officer when Mr. Bishop refused to submit to the completion of Chief Miller's illegal frisk of him was itself unlawful, and all evidence gained as a result of that unlawful arrest must be suppressed." Moreover, he challenged the validity of the arrest in front of the Court of Appeals.

attempting to perform an official act or duty of his office.

The term "duty" in section 18–705 includes only "those lawful and authorized acts of a public officer."[8] *State v. Wilkerson,* 114 Idaho 174, 180, 755 P.2d 471, 477 (Ct.App.1988), *aff'd,* 115 Idaho 357, 358, 766 P.2d 1238, 1239 (1988). Because an unlawful act is not considered a "duty" under the statute, an individual may peacefully obstruct or refuse to obey an officer's unlawful act without violating the statute. *Id.* An individual may not, however, use force or violence to resist. *Id.* Accordingly, whether Bishop's arrest for obstruction was lawful depends on whether the frisk he was arrested for resisting was a "duty" under the meaning of section 18–705.

When an officer conducts a legal search, he or she is performing a duty of his or her office under section 18–705. *See State v. Wiedenheft,* 136 Idaho 14, 16–17, 27 P.3d 873, 875–76 (Ct.App.2001). In *Wiedenheft,* officers responded to a domestic violence report at Wiedenheft's home. *Id.* at 15, 27 P.3d at 874. When Wiedenheft answered the door, the police noticed that she seemed shaky and upset and appeared to have been recently injured. *Id.* Upon questioning by the officers, Wiedenheft insisted that there was not a problem and repeatedly refused to let them into her home. *Id.* When she attempted to shut her door, one of the officers stopped it with his foot and was struck in the shoulder with the door. *Id.* The officers then arrested Wiedenheft for resisting and obstructing a police officer under section 18–705. *Id.* Wiedenheft was convicted by a jury and subsequently appealed her conviction. *Id.* On appeal, the Idaho Court of Appeals affirmed Wiedenheft's conviction after concluding that the officers' warrantless entry into her home was a constitutional search. *Id.* at 17, 27 P.3d at 876. The court reasoned

that the officers were discharging a "duty" under section 18–705 because their warrantless entry was lawful. *Id.* at 16–17, 27 P.3d at 875–76. More specifically, the entry was justified by the exigent circumstances exception to the warrant requirement. *Id.* at 17, 27 P.3d at 876. Because the officer's entry was constitutional, Wiedenheft's refusal to let him in constituted a violation of section 18–705. *Id.*

On the other hand, when an officer conducts an illegal search, the search is not a duty under section 18–705 and an individual may peacefully resist the search without violating the statute. *Graves v. City of Coeur d'Alene,* 339 F.3d 828, 841 (9th Cir.2003), *abrogated on other grounds by Hiibel v. Sixth Judicial Dist. Court of Nevada,* 542 U.S. 177, 189, 124 S.Ct. 2451, 2460, 159 L.Ed.2d 292, 304 (2004). In Graves, a police officer observed a protester carrying a heavy backpack that contained two round cylindrical objects.[9] *Id.* at 835–36. The officer approached the protester and asked to search the backpack out of concern that it contained a bomb. *Id.* at 836. After the protester refused the officer's request several times, the officer demanded that the protester submit to a search. *Id.* at 836–37. The protester refused again and the officer arrested him for obstructing under section 18–705. *Id.* at 837. The protester later sued the officer for false arrest and violation of his Fourth Amendment rights, but lost at trial. *Id.* at 833, 837. After the trial court denied the protestor's motion for judgment notwithstanding the verdict, he appealed. *Id.* at 838. Relying on this Court's decision in *State v. George,* 127 Idaho 693, 905 P.2d 626 (1995), the Ninth Circuit Court of Appeals held that the protester's refusal to submit to the search could not serve as a basis for his arrest under section 18–705.[10] *Id.* at 841 n. 17, 844. The court reasoned that, because

---

**8.** Relying on a case from New Mexico, the State argues that "[t]he scope of an officer's authority should be examined by considering whether the officer is doing what he or she was employed to do or is engaging in a personal frolic of his [or her] own." *See State v. Doe,* 92 N.M. 100, 583 P.2d 464, 467 (1978). This interpretation, however, differs from the meaning of the term "duty" adopted by this Court. *See Wilkerson,* 114 Idaho

at 180, 755 P.2d at 477, *aff'd,* 115 Idaho at 358, 766 P.2d at 1239.

**9.** The objects turned out to be jars of peanut butter and jelly. Graves, 339 F.3d at 837.

**10.** The court, however, affirmed the trial court's decision on the grounds of qualified immunity. *Id.* at 848.

the officer did not have the legal authority to search the backpack, he was not performing a duty of his office under the meaning of section 18–705. *Id.* at 841–45. Accordingly, the protester's peaceful refusal to submit to the search did not constitute obstruction and his arrest for violating the statute was unlawful. *Id.*

These cases make clear that whether Bishop's arrest for obstructing an officer was lawful depends on whether the frisk itself was lawful.[11] *See Wiedenheft,* 136 Idaho at 16–17, 27 P.3d at 875–76; Graves, 339 F.3d at 841. If the frisk was unlawful, Bishop had a right to peacefully refuse to submit to the frisk and his subsequent arrest for resisting was unlawful. *See Graves,* 339 F.3d at 841. On the other hand, if the frisk was lawful, then Bishop was properly arrested for obstructing. *Id.*

**2.**

 As discussed above, to be reasonable a search must be authorized by a warrant that is based on probable cause, unless one of the exceptions to the warrant requirement applies. *Katz,* 389 U.S. at 357, 88 S.Ct. at 514, 19 L.Ed.2d at 585. One such exception is the pat-down search for weapons acknowledged by the United States Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889, 909 (1968). Under *Terry,* an officer may conduct a limited pat-down search, or frisk, "of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons." *Terry,* 392 U.S. at 16, 30, 88 S.Ct. at 1877, 1886, 20 L.Ed.2d at 902, 911; *see also Florida v. J.L.,* 529 U.S. 266, 270, 120 S.Ct. 1375, 1378, 146 L.Ed.2d 254, 259 (2000). Such a frisk is only justified when, at the moment of the frisk, the officer has reason to believe that the individual he or she is investigating is "armed and presently dangerous to the officer or to others" and nothing in the initial stages of the encounter dispels the officer's belief. *Terry,* 392 U.S. at 24, 30, 88 S.Ct. at 1881, 1884, 20 L.Ed.2d at 907, 911. The test is an objective one that asks whether, under the totality of the circumstances, a reasonably prudent person would be justified in concluding that the individual posed a risk of danger. *State v. Henage,* 143 Idaho 655, 660–61, 152 P.3d 16, 21–22 (2007); *see also Terry,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909. To satisfy this standard, the officer must indicate "specific and articulable facts which, taken together with rational inferences from those facts," in light of his or her experience, justify the officer's suspicion

11. The State argues that "willful resistance, delay or obstruction to even an unlawful search or seizure constitutes an independent crime for which a defendant may be lawfully arrested" and that Idaho does not recognize a right to resist an unlawful search or seizure. In making this argument, the State relies on cases from other jurisdictions, which hold that a suspect does not have the right to resist an unlawful frisk through the use of force. *See City of Columbus v. Fraley,* 41 Ohio St.2d 173, 324 N.E.2d 735, 740 (1975) (concluding that citizens are not entitled to *use force* to resist an unlawful arrest); *State v. Trane,* 57 P.3d 1052, 1062 (Utah 2002) (holding that individuals do not have the right to *physically resist* even an unlawful police order); *Commonwealth v. Hill,* 264 Va. 541, 570 S.E.2d 805, 809 (2002) (holding that individuals do not have "the right *to use force* to resist an unlawful detention or 'pat down' search") (emphasis added); *Brown v. City of Danville,* 44 Va.App. 586, 606 S.E.2d 523, 533 n. 7 (2004) (concluding that the defendant had "no right to *forcibly* resist the attempted pat down, regardless of whether the initial detention was justified") (emphasis added). The State also relies on *State v. Richardson,* 95 Idaho 446, 511 P.2d 263 (1973), which held that an individual does not have the right to use force or weapons to resist an unlawful arrest when he or she knows, or has reason to believe, the arrest is being made by a police officer. *Id.* at 451, 511 P.2d at 268. However, Richardson does not dictate the outcome in this case for two reasons. First, Richardson was interpreting Idaho Code section 18–2703, which made it a crime for individuals to use force or violence to resist a police officer in the performance of his or her duty. The statute was repealed in 1981. Second, the Court in that case only concluded that individuals must "refrain from using *force* or *any weapon* in resisting arrest regardless of whether or not there is a legal basis for the arrest." *Id.* (emphasis added). It did not address more passive forms of resistance not involving the use of force. *Wilkerson,* on the other hand, specifically addressed resistance by means other than physical force and held that peaceful resistance is permissible when an officer is not performing a lawful duty. *Wilkerson,* 114 Idaho at 180, 755 P.2d at 477, *aff'd,* 115 Idaho at 358, 766 P.2d at 1239 (concluding that an individual's passive resistance "does not present the same immediate risk of violence and physical harm as does forcible resistance"). Accordingly, the State's argument is flawed in that it ignores the distinction between peaceful and forceful resistance.

that the individual was armed and dangerous. *Henage*, 143 Idaho at 660, 152 P.3d at 21 (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. at 1879, 20 L.Ed.2d at 905). Although an officer need not possess absolute certainty that an individual is armed and dangerous, an officer's "inchoate and unparticularized suspicion or 'hunch'" is not enough to justify a frisk. *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909.

■ Several factors influence whether a reasonable person in the officer's position would conclude that a particular person was armed and dangerous. These factors include: whether there were any bulges in the suspect's clothing that resembled a weapon; whether the encounter took place late at night or in a high crime area; and whether the individual made threatening or furtive movements, indicated that he or she possessed a weapon, appeared nervous or agitated, appeared to be under the influence of alcohol or illegal drugs, was unwilling to cooperate, or had a reputation for being dangerous. *See Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S.Ct. 338, 343, 62 L.Ed.2d 238, 246 (1979); *Pennsylvania v. Mimms*, 434 U.S. 106, 112, 98 S.Ct. 330, 334, 54 L.Ed.2d 331, 337 (1977); *Henage*, 143 Idaho at 661–62, 152 P.3d at 22–23; *State v. Davenport*, 144 Idaho 99, 103, 156 P.3d 1197, 1201 (Ct.App.2007); *State v. Greene*, 140 Idaho 605, 609, 97 P.3d 472, 476 (Ct.App.2004); *State v. Holler*, 136 Idaho 287, 292, 32 P.3d 679, 684 (Ct.App. 2001); *State v. Babb*, 133 Idaho 890, 893, 994 P.2d 633, 636 (Ct.App.2000); *State v. Simmons*, 120 Idaho 672, 677, 818 P.2d 787, 792 (Ct.App.1991). Whether any of these considerations, taken together or by themselves, are enough to justify a *Terry* frisk depends on an analysis of the totality of the circumstances. *Henage*, 143 Idaho at 661–62, 152 P.3d at 22–23; *see also Terry*, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909.

■ For a frisk to be held constitutional, an officer must demonstrate how the facts he or she relied on in conducting the frisk support the conclusion that the suspect posed a risk of danger. *Henage*, 143 Idaho at 661–62, 152 P.3d at 22–23. In *Henage*, a police officer conducted a pat-down search on the passenger of a vehicle that had been pulled over

for a broken taillight. *Id.* at 657–58, 152 P.3d at 18–19. The officer decided to conduct the frisk after observing the passenger's nervous behavior and learning that the passenger had a knife. *Id.* at 658, 152 P.3d at 19. During the frisk, the officer discovered the knife, a glass pipe, and a cigar tube containing methamphetamine. *Id.* The passenger, who was charged with possession of a controlled substance and drug paraphernalia, filed a motion to suppress, arguing that the frisk was illegal. *Id.* The trial court denied the motion and the passenger appealed to this Court. *Id.* On appeal, we held that the evidence should have been suppressed because it was discovered during an unlawful frisk. *Id.* at 662–63, 152 P.3d at 23–24. We reasoned that the passenger's nervous appearance did not justify the conclusion that he was armed and dangerous because the officer "did not connect [the passenger's] nervousness with anything tending to demonstrate a risk to his safety." *Id.* at 661–62, 152 P.3d at 22–23. Moreover, the passenger's admission that he had a knife did not justify the search because weapon possession, in and of itself, does not necessarily mean that a person poses a risk of danger. *Id.* at 662, 152 P.3d at 23. In fact, the circumstances indicated that the passenger was not dangerous because he did not act threatening, did not have a reputation for violence, did not make any furtive movements, and was cooperative and polite. *Id.* at 661–62, 152 P.3d at 22–23. The fact that the officer may have had a subjective feeling that his safety was compromised was irrelevant under the objective totality of the circumstances analysis. *Id.* at 662, 152 P.3d at 23.

■ In this case, the State failed to show how the facts known to Miller would cause a reasonable person to conclude that Bishop was armed and dangerous. Although Miller testified that he decided to conduct the frisk in order to ensure his safety, he did not identify any objective facts to support his conclusion that his safety was in danger. Miller testified that he decided to conduct the frisk because Bishop's "statements …, physical body language, [and] everything about [the situation] made me *feel* that [Bish-

op] *could possibly* have a weapon on him."[12] There are several problems with Miller's attempted justification. First, the test for determining whether a frisk was lawful is objective and, therefore, Miller's subjective feelings cannot be relied on to justify the frisk. *See Henage,* 143 Idaho at 660, 662, 152 P.3d at 21, 23. Further, Miller's feeling that Bishop could possibly be carrying a weapon would not justify a search even if his subjective feelings were relevant.[13] *Id.* at 662, 152 P.3d at 23. Second, none of Bishop's statements objectively indicate that he was dangerous. Bishop only stated "hello," "what is this about," that he was a Christian, that Jesus loved Chief Miller, and that he had just gotten off probation. Neither the substance nor the manner in which the statements were made suggest that Bishop posed a threat. Third, there is no evidence that Bishop's body language demonstrated that he was dangerous. Bishop simply stood there holding a white grocery bag close to his chest. Miller did not testify that he thought the bag contained a weapon, that Bishop was acting in a threatening manner, that Bishop made any furtive movements, or that Bishop appeared to be reaching for a weapon. Finally, Miller's statement that "everything about [the encounter]" prompted him to frisk Bishop does not support the conclusion that Bishop was armed and dangerous. Such a general statement does not include any objective facts that would indicate that Bishop was dangerous. Moreover, because Miller had very little interaction with Bishop before

he decided to conduct the frisk, it is unclear how "everything about the encounter" made him fear for his safety.

Although there was evidence that Bishop was acting nervous and may have been under the influence of a narcotic, those facts alone are not enough to justify the frisk.[14] *See, e.g., State v. Setterstrom,* 163 Wash.2d 621, 183 P.3d 1075, 1077 (2008) (concluding that police were not justified in frisking suspect where officer believed suspect was under the influence of an illegal drug, suspect was nervous, and suspect lied to officer about his identity); *State v. Pearson,* 348 N.C. 272, 498 S.E.2d 599, 600–01 (1998) (holding that police officers did not have reason to believe individual was armed and dangerous just because he smelled of alcohol, appeared nervous, and provided inconsistent statements). Miller was unable to indicate how Bishop's nervous behavior or the fact that he may have been under the influence supported the conclusion that Bishop posed a risk of danger. *See Henage,* 143 Idaho at 661–62, 152 P.3d at 22–23. Additionally, Miller did not testify that Bishop behaved in an aggressive or threatening manner or that, based on his experience, suspects under the influence of narcotics tend to resort to violence.

The record does not contain evidence that would cause a reasonable person in Miller's position to conclude that Bishop posed a risk of danger. Miller's encounter with Bishop took place in public, while it was still light out, and there has been no suggestion that

---

**12.** Similarly, Miller testified that "the way [Bishop] was acting, I wasn't sure if he—if he had a weapon or—You know, his mental state at that point seemed to me that he could—he could be dangerous." Miller went on to state that he decided to frisk Bishop because of "[Bishop's] actions.... The way—his body language, his appearance. The things that he had said to me about [being a] Christian and Jesus loves me, too; which was a comment that just came out of the blue, made me feel that he wasn't—you know, I wasn't sure what I was dealing with." However, Miller did not specify what Bishop's mental state was, how he was able to evaluate it, or why it led him to conclude that Bishop posed a risk of danger. Moreover, at no time did Miller indicate what it was about Bishop's body language, appearance, or statements that led him to believe that Bishop may have been dangerous.

**13.** The fact that Bishop "could possibly" be carrying a weapon does not distinguish him from

any other individual the police encounter. An officer can never be sure whether a person is carrying a weapon because Idaho law authorizes individuals to carry concealed weapons once they obtain a permit. *See* I.C. § 18–3302. If an officer's bare assertion that a suspect "could possibly" be carrying a weapon was enough to establish that a person posed a risk of danger, officers could frisk any person with whom they come into contact.

**14.** The State argues that the frisk was also justified because "[i]t was reasonable for a solo police officer to frisk a drug suspect whom he is about to transport in a patrol car ... for officer safety." However, no evidence was presented to support the State's argument that Miller decided to frisk Bishop because he intended to transport him.

Bishop was stopped in a high crime area. Miller did not report observing any unusual bulges in Bishop's clothing or other facts that would have indicated that Bishop was carrying a weapon.[15] Moreover, there was no evidence that Bishop had a known reputation for violence or was acting in a threatening manner. In fact, Miller testified that, if anything, Bishop's behavior led him to believe that Bishop wanted to run away from him. There was no indication that Bishop appeared to be prepared to use force or violence to escape. Instead, the facts show that once Miller ordered Bishop to stop, Bishop was compliant and cooperative. Bishop told Miller "hello" and then asked what they needed to speak about. He also told Miller that he was a Christian and that Jesus loved Miller. He did not make any furtive movements or appear to reach for a weapon; instead, he held onto his grocery bag during the entire encounter, thereby making his hands visible to Miller at all times.

■■■ Based on a consideration of the totality of the circumstances, a reasonable person would not conclude that Bishop posed a risk of danger and, therefore, Miller's frisk of Bishop was unlawful. Because the frisk was unlawful, it was not a duty under section 18–705 and Bishop was entitled to peacefully refuse the frisk.[16] *See Graves*, 339 F.3d at 841 (concluding that because individuals have a constitutional right to refuse consent to unlawful searches it would be illogical to arrest them for peaceably asserting their constitutional rights). Bishop peacefully resisted the unlawful frisk by merely turning around and telling Miller "no."[17] He did not use force or violence to resist. Accordingly, Miller did not have probable cause to arrest Bishop for obstructing an officer, the arrest was unlawful, and the evidence obtained during a search incident to that arrest should have been excluded.[18]

## III.

The district court's denial of Bishop's motion to suppress is hereby reversed, the judgment of conviction vacated, and the case remanded for proceedings consistent with this opinion.

**15.** Although Bishop was carrying a white grocery bag, Miller did not testify that the bag appeared unusual or that it appeared to contain a weapon.

**16.** Practical considerations also favor this result. If individuals could be arrested for peacefully resisting an unlawful frisk, an officer could order anyone on the street to submit to a frisk and, if the person merely answered "no," the officer could arrest him or her for resisting and conduct a search incident to arrest. This would give officers an incentive to violate the constitution. It would also punish individuals for asserting their constitutional rights. For instance, if Bishop had not resisted the frisk, any evidence retrieved during the frisk would have been suppressed. The evidence should not be admitted against him just because he peacefully refused to comply with an unlawful search. *See United States v. Fuentes*, 105 F.3d 487, 490 (9th Cir. 1997) ("People do not have to voluntarily give up their privacy or freedom of movement, on pain of justifying forcible deprivation of those same liberties if they refuse."). Moreover, concluding that a person may peacefully resist an unlawful frisk, for example by turning around and saying "no," does not raise the same concerns for public safety as would allowing resistance by physical force or violence.

**17.** Although Bishop struggled when Miller tried to handcuff him, the struggle took place *after* Miller decided to arrest Bishop for resisting the frisk, so the struggle is irrelevant in determining whether Bishop's resistance to the frisk was lawful. *See Wilkerson*, 114 Idaho at 180, 755 P.2d at 477, *aff'd*, 115 Idaho at 358, 766 P.2d at 1239 (concluding that the fact that a defendant used force after she was placed under arrest for peacefully resisting an unlawful order was not relevant in deciding whether her initial resistance was lawful). It must be noted that Bishop was neither arrested nor charged for resisting arrest.

**18.** The State has not articulated any other basis on which the evidence would be admissible. It does, however, argue that Bishop has not sought to suppress testimony regarding his acts of resisting and obstructing the frisk and, therefore, that the Court of Appeals should not have vacated Bishop's conviction for resisting and obstructing. In making this argument, the State maintains that federal and state courts have "uniformly rejected the argument that trial courts should suppress evidence relating to [the defendant's] violence or threatened violence to police officers subsequent to an unlawful search or seizure." However, the State's argument is irrelevant since the testimony presented actually supports the conclusion that Bishop was not guilty of resisting and obstructing because he did not use force or violence to resist the unlawful frisk.

Justice BURDICK, W. JONES and HORTON, and Justice Pro Tem TROUT concur.