IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 36233

| MARK W. GABLE, | ) | 2010 Unpublished Opinion No. 520 |
|---|---|---|
| | ) | |
| Petitioner-Appellant, | ) | Filed: June 22, 2010 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| STATE OF IDAHO, | ) | THIS IS AN UNPUBLISHED |
| | ) | OPINION AND SHALL NOT |
| Respondent. | ) | BE CITED AS AUTHORITY |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Michael E. Wetherell, District Judge.

Order summarily dismissing application for post-conviction relief, <u>affirmed</u>.

Nevin, Benjamin, McKay & Bartlett LLP, Boise, for appellant. Annie O. McDevitt argued.

Hon. Lawrence G. Wasden, Attorney General; Jessica M. Lorello, Deputy Attorney General, Boise, for respondent. Jessica M. Lorello argued.

_____

GRATTON, Judge

Mark W. Gable appeals from the district court's order summarily dismissing his application for post-conviction relief following an evidentiary hearing. We affirm.

I.

FACTS AND PROCEDURAL BACKGROUND

The factual and procedural background of the underlying criminal proceeding is set forth in *State v. Gable*, Docket No. 32446 (Ct. App. Oct. 16, 2007) (unpublished):

> At Gable's trial, a loss prevention employee from a store testified that she contacted the police because a male and female had entered her store with a baby carrier and appeared very suspicious and nervous, to the point of seeming paranoid. The female was observed in the cold medicine aisle of the store and could not stop moving. The female asked the employee what the difference was between the regular Sudafed and the store brand, and then the male and female left the store. The employee testified that the two individuals met Gable at a vehicle and threw the baby carrier in the back seat.

1

In response to the employee's call, the civilian supervisor of the crime prevention unit arrived at the store and observed Gable drive his male and female companions across the street to another store. At the second store, the male and female again removed the baby carrier and entered the store, returning to the vehicle a few moments later. The supervisor said the trio repeated this suspicious behavior again at a third and fourth store. After the fourth store, a marked police unit was contacted. Gable's vehicle was stopped based on the trio's suspicious behavior and some concern over whether there was a live baby in the carrier, which had been thrown into the back of the vehicle after exiting each store.

Gable was arrested for driving without privileges. A search of his vehicle incident to arrest revealed methamphetamine, drug paraphernalia, empty Dimetap boxes and blister packs, a ledger with numbers and colors written in it, and approximately one thousand pseudoephedrine pills. The police also found the baby carrier, which contained only a doll, and a diaper bag lined with aluminum foil. Gable was charged with four counts of conspiracy to commit burglary, I.C. §§ 18-1401 and 18-204, and conspiracy to traffic in methamphetamine by manufacturing, I.C. §§ 37-2732B(a)(3), 18-1701.

. . . .

A jury found Gable guilty of three of the four counts of aiding and abetting burglary and conspiracy to traffic methamphetamine by manufacturing.

On direct appeal, Gable argued, among other things, that the district court erred in denying his mid-trial motion to suppress evidence found in his vehicle because the officers lacked a reasonable, articulable suspicion to stop his vehicle. This Court held that the district court abused its discretion "by entertaining Gable's motion without first applying the legal standards set forth in I.C.R. 12--namely requiring Gable to show whether good cause or excusable neglect existed." *Gable*, Docket No. 32446. We concluded that because Gable's motion was untimely, the district court's ultimate denial of Gable's motion on the merits could not constitute reversible error and, after discussing the other issues presented, affirmed Gable's judgment of conviction and sentences. *Id.*

Gable filed a timely application for post-conviction relief, contending that he received ineffective assistance of trial and appellate counsel, and that his conviction and sentence were in violation of the Idaho and United States Constitutions. Specifically, and of relevance to this appeal, Gable argued that his trial counsel was ineffective for failing to "file a motion to suppress evidence due to illegal stop." Gable also filed a motion to appoint counsel, which was granted.

The district court issued a notice of its intention to dismiss all but Gable's claims of ineffective assistance of trial and appellate counsel. The State filed an answer and moved for summary dismissal of Gable's application. Gable filed a response to the district court's notice

regarding summary dismissal, arguing only his allegations of ineffective assistance of trial and appellate counsel. The court summarily dismissed all of Gable's claims, except for his claims that he received ineffective assistance of trial and appellate counsel, and scheduled an evidentiary hearing. Following the hearing, the court issued an order denying Gable's application for post-conviction relief. Gable appeals.

## II.

## ANALYSIS

### A.     Motion to Suppress

Gable asserts that trial counsel's performance was deficient because, by relying solely upon the police reports and the preliminary hearing transcript, counsel failed to adequately investigate the circumstances of the traffic stop, which would have revealed that there was not a baby in the baby carrier, and that the officers did not believe there was a baby in the carrier. He further argues that he was prejudiced because, had a motion to suppress been timely filed, it would have been successful due to the fact that the officers lacked reasonable, articulable suspicion to stop Gable's vehicle based upon either child endangerment or suspected shoplifting.[1]

A claim of ineffective assistance of counsel may properly be brought under the Uniform Post-Conviction Procedure Act. *Hughes v. State*, 148 Idaho 448, 451, 224 P.3d 515, 518 (Ct. App. 2009). To prevail on an ineffective assistance of counsel claim, the defendant must show that the attorney's performance was deficient and that the defendant was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Hughes*, 148 Idaho at 451, 224 P.3d at 518. To establish a deficiency, the applicant has the burden of showing that the attorney's representation fell below an objective standard of reasonableness. *Aragon v. State*, 114 Idaho 758, 760, 760 P.2d 1174, 1176 (1988); *Hughes*, 148 Idaho at 451, 224 P.3d at 518. To establish prejudice, the applicant must show a reasonable probability that, but for the attorney's deficient performance, the outcome of the trial would have been different. *Aragon*, 114 Idaho at 761, 760 P.2d at 1177; *Hughes*, 148 Idaho at 451, 224 P.3d at 518. This Court has long-adhered to the proposition that tactical or strategic decisions of trial counsel will not be second-guessed on appeal unless those decisions are based on inadequate preparation, ignorance of relevant law,

---

[1]     Gable raised, and the post-conviction court ruled on, other claims below. None of the court's other rulings are at issue in this appeal.

or other shortcomings capable of objective evaluation. *Howard v. State*, 126 Idaho 231, 233, 880 P.2d 261, 263 (Ct. App. 1994).

In a post-conviction proceeding challenging an attorney's failure to pursue a motion in the underlying criminal action, the district court may consider the probability of success of the motion in question in determining whether the attorney's inactivity constituted incompetent performance. *Boman v. State,* 129 Idaho 520, 526, 927 P.2d 910, 916 (Ct. App. 1996). Where the alleged deficiency is counsel's failure to file a motion, a conclusion that the motion, if pursued, would not have been granted by the trial court, is generally determinative of both prongs of the *Strickland* test. *Boman*, 129 Idaho at 526, 927 P.2d at 916.

Although the probability of success on a motion is generally determinative of both prongs of the *Strickland* test, the posture of this case presents a peculiar situation as trial counsel did orally raise a motion to suppress at trial, and the district court reviewed and denied it. Gable contends, however, that "but for [trial counsel's] deficient performance in raising the suppression issue too late and without just cause, it is reasonably likely the Court of Appeals would have held the officers lacked reasonable and articulable suspicion to stop Mr. Gable's car, thus satisfying the prejudice prong." While this Court did not address the merits of Gable's motion on his direct appeal, we do so now. We conclude that even assuming that trial counsel rendered deficient performance by failing to raise a timely motion to suppress, Gable has failed to demonstrate any resulting prejudice because a motion to suppress would not have been successful as the officers had reasonable, articulable suspicion to stop Gable's vehicle.

### 1.    Reasonable, articulable suspicion

The Fourth Amendment to the United States Constitution prohibits government agents from conducting unreasonable searches and seizures. When a private vehicle is stopped by the police, all of its occupants are "seized" and may seek suppression of evidence if the seizure did not comply with Fourth Amendment standards. *Brendlin v. California*, 551 U.S. 249 (2007); *State v. Luna*, 126 Idaho 235, 880 P.2d 265 (Ct. App. 1994). To pass constitutional muster, a detention to investigate possible criminal activity must be based upon reasonable suspicion, derived from specific articulable facts, and the rational inferences that can be drawn from those facts, that the person stopped has committed, or is about to commit, a crime. *Terry v. Ohio*, 392 U.S. 1, 26-27 (1968); *State v. Bishop*, 146 Idaho 804, 811, 203 P.3d 1203, 1210 (2009); *State v. Sheldon*, 139 Idaho 980, 983, 88 P.3d 1220, 1223 (Ct. App. 2003); *State v. Salato*, 137 Idaho

4

260, 264, 47 P.3d 763, 767 (Ct. App. 2001). The quantity and quality of information necessary to create reasonable suspicion for such a "*Terry* stop" is less than that necessary to establish probable cause, *Alabama v. White*, 496 U.S. 325, 330 (1990); *Bishop*, 146 Idaho at 811, 203 P.3d at 1210, but must be more than a mere hunch or unparticularized suspicion. *Terry*, 392 U.S. at 27.

When a defendant challenges the validity of a vehicle stop, the burden is on the State to prove that the stop was justified. *Florida v. Royer*, 460 U.S. 491, 500 (1983); *State v. Sevy*, 129 Idaho 613, 614-15, 930 P.2d 1358, 1359-60 (Ct. App. 1997). The reasonableness of a stop is determined by looking at the totality of the circumstances confronting the officer at the time of the stop. *United States v. Cortez*, 449 U.S. 411, 417 (1981); *State v. Rawlings*, 121 Idaho 930, 932, 829 P.2d 520, 522 (1992). An officer may draw reasonable inferences from the facts in his or her possession, and those inferences may be informed by the officer's experience and law enforcement training. *State v. Montague*, 114 Idaho 319, 321, 756 P.2d 1083, 1085 (Ct. App. 1988).

Gable contends that stopping his vehicle was "unconstitutional because merely entering and exiting four different stores does not give rise to the reasonable and articulable suspicion necessary to initiate a traffic stop." He argues that the officers likely knew that their observations did not amount to the suspicion necessary to stop the vehicle and, thus, attempted to justify the stop on the basis of possible child endangerment. Gable asserts that the stop was unjustified on either basis. However, a review of the facts reveals that the officers had reasonable, articulable suspicion that Gable had been, or was about to be, engaged in shoplifting.

On January 10, 2005, loss prevention specialist Sabrina Lythgoe was performing audits, as well as her duties relating to shoplifting prevention and identification of shoplifters. Lythgoe, along with other loss prevention employees at various retail stores in the Boise area, received training through law enforcement, which was provided by Kurt Crum, the civilian supervisor of the Boise Police Department crime prevention unit. Lythgoe testified that, as a loss prevention employee, whenever there is "an issue that [she] can't take care of," she calls Crum. As part of her training, Lythgoe received information about what products are used to manufacture methamphetamine, including cold medicines containing pseudoephedrine. Cold medicine packages have an EAS, or electronic article system surveillance tag, which activates an alarm unless deactivated by a cashier when purchasing the item. Loss prevention employees were

5

notified, through their training, that individuals are able to circumvent the EAS tag by lining their bags with foil. Lythgoe testified that she also received training regarding the mannerisms of individuals who may try to procure pseudoephedrine in order to manufacture methamphetamine. She testified that she looked for "tweakers," or people that "don't act in a normal stage," such as individuals who are "moving around a lot or they have nervous manners of looking around, paranoia."

While performing her job duties, Lythgoe observed a male and female, later identified as Hamby and Rogers, respectively, enter her store with a baby carrier and a diaper bag. Lythgoe testified that Rogers was "very thin" and "acting in a very nervous manner." Rogers was looking at Sudafed and had some in her hand. Lythgoe stated that Rogers was looking around in a "nervous manner," "couldn't hold still," and was "all over the place." Rogers asked Lythgoe what the difference was between the regular Sudafed and the store brand, to which Lythgoe responded that she did not know and did not work at the store. Lythgoe testified that Rogers then put the Sudafed down, "looked around in a nervous manner, like somebody was watching them, paranoia," and then exited out the apparel entrance. Lythgoe testified that Rogers and Hamby met Gable at a vehicle and threw the baby carrier in the back seat. Lythgoe acknowledged that she never actually saw or heard a baby in the carrier.

Based upon her observations, as well as her training and experience, Lythgoe notified Crum that there were some potential shoplifting suspects at her store. Upon arriving at the store, Crum established a surveillance position. Crum saw Gable enter the same store through the front entrance and then exit approximately ten minutes later through the garden center. Crum testified that in his experience, people involved in theft activity commonly enter and exit different doorways. Crum testified that he had been with the crime prevention unit for eighteen years, that he had received training in the recognition of shoplifting and surveilling possible shoplifters, and had provided training to local businesses regarding shoplifting, for sixteen years. Crum testified that as Gable walked out, he was "indexing" a bulge in his left-front pants pocket, which is a "behavior that's pretty common either to theft activity or people are even caring [sic] weapons where they almost subconsciously draw attention to it when they are trying not to by pushing it down or looking down."

Crum then observed the trio drive across the street to another store. When they arrived, Hamby and Rogers retrieved the baby carrier out of the back seat and entered the store. Crum

6

called the store manager to advise them to watch the pair. Upon exiting the store, Crum again called the manager who advised him that "they probably didn't get anything" because they had "stayed with them while they were in the store."

Crum testified that the trio then drove a short distance to a third store, where Hamby and Rogers again took out the baby carrier and entered the store. Crum testified that he was "[n]ot sure whether there was a baby in it, because they had a blanket over it." Crum testified that he also entered the store and observed Rogers "walking out of the aisle that contained Sudafed carrying the baby carrier."

Crum then followed the trio across the street to a fourth store. Crum had notified the Meridian Police Department that he may need some assistance and an unmarked unit had arrived and established a surveillance position. Hamby and Rogers again took the baby carrier into the store. Crum was able to get into a position to observe the Sudafed aisle without being detected, and testified that Hamby and Rogers "walked up to the aisle and looked to the area where the Sudafed was," which was right next to the pharmacy. Crum testified that there were "two or three pharmacists standing right there." Hamby and Rogers then pushed the cart around the store, made a minor purchase, and exited the store.

Sergeant de St. Germain of the Meridian Police Department, who was conducting surveillance outside the store, testified that the pair exited the store and Hamby "chucked the child care carrier in the back and this doll ejected out of the carrier." Sergeant de St. Germain and Crum conferred regarding their observations and ultimately decided to have a marked unit stop the vehicle. The vehicle was stopped based upon the collective observations of the officers. Crum testified that the primary reason for the stop "was to check the welfare of a child, if there indeed was a child in there." Sergeant de St. Germain testified that the vehicle was stopped based on Crum's observations regarding suspected shoplifting as well as the fact that it was "very suspicious" that "somebody would be carrying a baby carrier with a baby doll inside of it and just chuck it in the back of a car."

The stop was reasonable based upon the totality of the circumstances confronting the officers at the time of the stop. *See Cortez*, 449 U.S. at 417; *Rawlings*, 121 Idaho at 932-33, 829 P.2d at 522-23. Gable argues, relying upon case law from other jurisdictions, that "merely looking at and purchasing Sudafed does not create reasonable suspicion sufficient to justify an investigatory stop." He argues that the facts of *State v. Schneider*, 80 P.3d 1184 (Kan. Ct. App.

7

2003), are similar to this case and support a finding that the officers lacked reasonable suspicion to stop Gable's vehicle.

In *Schneider*, police officers received a phone call from an in-store protection specialist who had observed two males talking in the cold pill aisle as they each picked up two packages of cold tablets containing pseudoephedrine. One of the males waited outside the store in a truck after purchasing two packages of cold tablets, while the second male walked around the store eventually purchasing some toys, football cards, and shampoo in addition to the two packages of cold tablets. A police investigator arrived at the store and followed the truck to see if the men were going to other stores to purchase other ingredients to manufacture methamphetamine. The men stopped at a convenience store, and the officer did not observe any suspicious activity. The investigator observed that the driver of the truck failed to use his turn signal, and the decision was made that a marked unit would stop the vehicle. The vehicle was eventually stopped some fifteen miles beyond the city and considerably after the signal violation. An investigation ensued and the vehicle was ultimately searched yielding drug residue, drug paraphernalia, and items associated with the manufacture of methamphetamine. *Schneider*, 80 P.3d at 1186-87.

The court in *Schneider* held that the "defendants' purchase of the cold pills alone is not sufficient to constitute reasonable suspicion that they intended to commit a crime." *Id.* at 1189. The court noted that the defendants did not purchase any other items associated with the manufacture of methamphetamine, and determined that the purchase of cold pills at the same store did not provide "any basis to support the inference that the defendants intended to use them to manufacture methamphetamine." *Id.* Thus, the court concluded that the officers could not conduct a stop of the vehicle "based solely on the information about the cold pills." *Id.*

Gable contends that the officers here had less information than in *Schneider* because Hamby and Rogers did not even purchase any cold medicine. Gable's reliance upon *Schneider* is misplaced, however, because it ignores a fundamental distinction between that case and the present one. In *Schneider*, the officers only had information regarding the legal purchase of cold pills, which they then inferred meant that the defendants intended to use them to manufacture methamphetamine. Here, while the officers may have had suspicion that the trio was attempting to procure pseudoephedrine in order to manufacture methamphetamine, that was not the purpose

8

of the stop. Rather, the officers stopped the individuals in this case for suspected shoplifting, which, as noted above, was based upon their collective observations.[2]

Moreover, the officers in this case had much more information available to them to support a finding of reasonable suspicion. Rogers exhibited nervous and paranoid behaviors. The group traveled to four stores in a short period of time. On each occasion they took a baby carrier into the store, but they put the carrier in the back of the automobile without due care. They entered and exited through different doors. Gable indexed a bulge in his pocket. The officers later observed a baby doll, rather than a real baby, inside the baby carrier adding to the suspicion of shoplifting. On each occasion they entered the Sudafed aisle. Bags or carriers are sometimes used to get stolen items past detectors by use of foil lining. The officers were free to draw reasonable inferences from the facts in their possession, which inferences may be drawn from the officers' experience and law enforcement training. *See Montague*, 114 Idaho at 321, 756 P.2d at 1085. Based upon the collective knowledge of the officers involved in the investigation and the totality of the circumstances known to the officers at the time of the stop, the stop was based upon "reasonable suspicion supported by articulable facts that 'criminal activity may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

Gable contends that he and his co-defendants engaged in "perfectly legal behavior." While there may have been several innocent explanations for their behavior, the possibility of innocent explanations for a defendant's behavior does not preclude reasonable suspicion that he or she may be involved in criminal activity. *See State v. Nevarez*, 147 Idaho 470, 476, 210 P.3d 578, 584 (Ct. App. 2009). As the United States Supreme Court observed:

> Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation. The officer observed two individuals pacing back and forth in front of a store, peering into the window and periodically conferring. All of this conduct was by itself lawful, but it also suggested that the

---

[2] Gable also cites the following opinions, which are all distinguishable from the present case: *State v. Carlson*, 123 P.3d 891 (Wash. Ct. App. 2005) (involving legal purchase of muriatic acid and denatured alcohol by individuals with rough and unkempt appearances); *People v. Lomas*, 812 N.E.2d 39 (Ill. App. Ct. 2004) (involving legal purchase of unknown amount of Sudafed by four unidentified males); *State v. Bulington*, 802 N.E.2d 435 (Ind. 2004) (involving legal purchase, by defendant and companion, of three boxes of antihistamines each); *State v. Knight*, 104 P.3d 403 (Kan. Ct. App. 2004) (involving legal purchase of two boxes of cold tablets, a six-pack of bottled water, and ordinary table salt).

individuals were casing the store for a planned robbery. *Terry* recognized that the officers could detain the individuals to resolve the ambiguity.

*Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (citations omitted); *see also Nevarez*, 147 Idaho at 476, 210 P.3d at 584. Here, as in *Terry*, all of this conduct was by itself lawful, but it also suggested that the individuals were using a baby carrier and diaper bag as a ruse to steal cold medicine containing pseudoephedrine from several retail stores.

## III.

## CONCLUSION

Gable failed to meet his burden of demonstrating prejudice as the officers had reasonable, articulable suspicion to stop his vehicle. Accordingly, the district court's order summarily dismissing Gable's application for post-conviction relief is affirmed. No costs or attorney fees are awarded on appeal.

Chief Judge LANSING and Judge GUTIERREZ, **CONCUR.**